Good afternoon everyone, welcome to the Illinois Appellate Court, 1st District, 6th Division. We ask that the lawyers who are going to argue please step up briefly, introduce themselves, and tell us whom you represent. Good morning, and your honors. Good afternoon, I'm Tom Bradley, and I represent the state of Illinois. I'm Joel DeAlbert, and I represent Troopers Lodge No. 41 v. Illinois Labor Rekaions Rd. Good afternoon, I'm Assistant Attorney General Ann Macalera, representing the Illinois Labor Rekaions Board State Panel, a respondent in each administrative review action. Thank you. These cases have been consolidated, so the troopers are seeking review, and the state CMS is seeking review. So technically, you're on the same side, although you really aren't. Have you reached any agreement about splitting time, or should we just sort of go with the flow? We haven't spoken about splitting time, but I'm wondering whether we would be able to have more than 15 minutes. We certainly will give you a reasonable amount of time. This is, as you know, a very complicated and lengthy record. I think the troopers have the lower number case, so let's have counsel for the troopers proceed first. We'll give you about 20 minutes. We'll give an equivalent amount of time for the state, and then the attorney general can respond as well. Your honor, just to be clear, then both petitioners will go first and present their opening argument, and then I, as a respondent, will present the response argument to both petitioners. That's correct. Thank you. And then the problem is the union and the CMS need to respond to each other. Right. May we have a bottle as well? Yes, you'll have a bottle. Thank you. So let's try to do it that way, where we have everybody come up once, and then maybe everybody come up a second time and respond to each other, and we'll let the attorney general have the last word. Does that sound like it will work? Yes, it does. All right, thank you. Thank you, your honor. Mr. DeAlva, you may proceed when you're ready. May it please the court, I am Joe DeAlva representing Troopers Lodge 41 in this case. This case involves a stipulation and a single bargaining unit. The single bargaining unit is Troopers Lodge 41, certified by the labor board in the late 1980s. It is not a bargaining unit of all state workers. It is a bargaining unit of approximately 1,350 employees, which means that they get to bargain about with the state, wages, hours, and working conditions. And when the General Assembly enacted the Labor Act for purposes of bargaining and determination, it did not say there would be one single bargaining unit discussion for all health care questions. So we get bargained, the state police union is bargained over wages, hours, and working conditions for a very long time. The complaint in this case does not involve all other state workers. The state takes the position this case involves 450,000 persons, approximately 250,000 of whom are state workers and their dependents, and another 100,000 are annuitants and employees who work for local governments or colleges. This case does not involve anything beyond the 1,350 state troopers. The stipulation in this case was very clear. The interest arbitrator, upon knowing and noting that there was a stipulation of impasse over wages, hours, and working conditions, set a series of ground rules. One of them was, you'll submit your final offers. The other was, you are their jurisdiction over this case. With respect to the question of jurisdiction, there was a stipulation that there was authority for the arbitrator to consider wages, hours, and working conditions. No authority was asserted by the state for the arbitrator to consider all the other employees in the state for purposes of health care. This is sort of like the Ford Motor case that we put in our brief, where Ford had six or seven unions, and there was bargaining requests for vending machines, and Ford didn't want to bargain with six or seven unions over vending machine prices for the kinds of candies and sodas that workers would have at the Torrance Avenue stamping point. And so the Supreme Court heard the case and said, Ford's argument of disruption from bargaining here fails. You have to bargain with one union. That's essentially the argument that's been created here. The state did not object to arbitrability on the question of health care. And then when the question came before the arbitrator as to the final offers, all parties submitted final offers. The very first offer... Before you go on to the next slide, from your client's position, when was the first time chronologically that the state asserted any objection in any form that health insurance was not either permissive or an injury subject to bargaining? On August 9th, 2016, the state objected to the arbitration panel that it didn't have jurisdiction and it's all static. And at that point, the arbitration panel was concluding its work, wasn't it? The hearing had ended four months earlier, and the arbitration panel had been given briefs, and the arbitration panel was writing a decision, and in the brief, the state put in the footnote that it wasn't contesting the issue of arbitrability on this particular question. The state filed an unfair labor practice charge, but said in its footnote, notwithstanding this unfair labor practice charge, we are not contesting the arbitration, the right of the arbitrator, to consider this question of health care. That unfair labor practice charge was dismissed, and then the executive director issued a decision dismissing it. The labor board, months later, on August 2nd, returned the executive director and then said in its decision, we want a full and complete record on health care questions. They got 22,000 pages. Briefs were well over 100 pages on our side. AOJ wrote a decision about 110 pages, and then the board wrote a decision that said, we're not going to consider these other issues on levels of benefits because we only have a fully developed record. It's really not supported by the record. Let me digress for a second here. Let's put sanctions aside for a minute. Let's put that issue aside, and let's put the issue of the timeliness of the states raising its objections to this side. Both sides seem to be treating this almost like a declaratory judgment case. They're asking us to decide which, if any, of the five elements of health insurance, the deductibles, the copay, the OPMs, are either mandatory, permissive, or prohibitive subjects of borrowing. But what we really have here is an unfair labor practice charge. That is the complaint that's on page four of the 21,000-page record. It's all about the unfair labor charge. Your union won. You got the unfair labor charge dismissed in the end. So we have case law that we've relied on. CMS didn't raise this, but I'm going to raise it to you. It basically says when you win the relief, you're a defendant. You win the relief. You can't come to us or come to the circuit court, if it was their review, and say, well, I'm glad I won, but I wanted to win for a different reason. If this is a declaratory judgment where a court was deciding which of the five would be covered, different story. But here the end result was the UOP got dismissed. If you won, so how can you ask us to say that now all five should be mandatory subjects of borrowing, as opposed to only three? Because in the hearing before the arbitrator, the state did not contest arbitrability. It didn't come to the arbitrator and say you can't consider this question until months after the hearing was over. We had a long hearing, and then we had an unfair labor facts record that was very long. We had four separate instances in which this issue has come up. It came up in 2014 in a declaratory ruling matter where the labor board's general counsel said we had a right to bargain about health care and all issues. It came up again in these 2015 negotiations. It came up again in the middle of this arbitration case. In March, the general counsel issued another declaratory ruling, and then there's this unfair labor practice case in which the board said we overturn the executive director's decision, and we want to have a complete record on everything. We spent, the union spent, a lot of money. The state spent a lot of money to have this case resolved. In all due respect, it is not in the public interest to not deal with the question. In terms of the error of the labor board, they made a decision that said you bargain about levels of benefits. You bargain about whether employees should have vision care, drug claim, dental care. These are questions that were not decided by the labor board, but the state placed these questions before the arbitrator in its final offer. When the board narrowed this matter to the question of premiums, out-of-pocket costs, and the two other matters that you mentioned, it had no authority to do it because there was no exception pending before the board by the employer. I'll give you that there was a lot of money spent on this, and it's been litigated in different forms and in different cases, but I think you're missing the point of my question. Let me set it in a different scenario. Let's say you have a tort case, and the defendant moves to dismiss it under 619 for state limitations. But the court says, well, I'm not convinced about that, but I'm dismissing it under 615. Defendant wins. Defendant can't appeal to us and say, no, I should have won under 619. Now, if the plaintiff appeals, he can raise both in defense. But you're the first one on the box here with your appeal. You've got the lower number, and what you're asking in your appeal, I'll give you that you can appeal the denial of the sanctions, but I have difficulty seeing how you can ask us in your appeal to overturn the board's decision that only three of the five elements were vulnerable. Because they violated their own rules with respect to accepting the employer's exception that you should not have to bargain about all these doubles of benefits that they themselves have placed before the labor board in their final office. So the rule at 12.00, 1.35d3, says every single exception has to be stated. We didn't do that. They claim, in our case, that we weighed that issue. We weighed the issue of Trump on the basis that the state did not make a timely good-faith objection under the administrative rules. We don't have to reach that issue, do we? We can meet the board's decision easily. Under the Wheaton case, no question about it. The reality is, when the board violated its rule, I think that's a matter that should come before you as well. And the rule, in my opinion, prevented the board from stating in its decision that it wasn't going to decide this other case, this other major important issue. That's really the issue as we see it in answer to the question. Was this issue before the board, a violation of its own rule? Yes, we raised it. And was it briefed or argued or just raised? We raised it. They claim we didn't raise it. We raised it in C-645, and we think that they're wrong to have asserted that we didn't raise it. In the record, we took the position on exceptions to the board's brief, to the state's brief to the board. We stated that the highlight of that particular section is the alternative argument. That's how they raised it. They said you should only deal with out-of-pocket expenses, OPMs, and premiums. Let me ask you a question, and the other two counsel can feel free to respond to it when they come up as well. That is, we are here to review the board's decision. The board's decision has three parts, as I read it. The first part deals with the timeliness of the state's objection in raising their argument that's not arguable. That section of the board's decision has a conclusion, and the conclusion says, for this reason, the UOP is dismissed. The second part of the board's decision deals with the statutory interpretation issue about the clash between the two acts, the Group Insurance Act and the Labor Act. That section of the board's decision has no conclusion. It simply says we opine that three of the five are mandatory and two are permissive. The third part of the board's decision is the sanctions, which is self-explanatory. But it doesn't appear to me that the board actually did anything with the UOP solely based on its determination as to the issue of statutory interpretation, which everybody has devoted a lot of their time to. What it said is the ALJ did, however. They had a very close line of work. They reviewed the ALJ's decision. They reviewed the board's decision. What the board said was that we're going to narrow their decision. And the narrowing of the decision led to the following. Employee choice, meaning employees having a health care benefit, levels of services, MRIs, surgical procedures, hospital care, prescription drugs, dental, vision, physical therapy, all these things, according to the board's decision, we're not going to talk about these things. But they are clearly subjects of bargaining in a lot of other cases. And so the reason we appealed on that point of the narrowing is they didn't have a right under their own rule to accept the employer's exception. The employer says, we want to accept. They never, they put it in their brief. They didn't file it as an exception. We made that argument to the board, and the board didn't cover it. All of them to say, we want to narrow this matter. And what the heart of this case is about, they spent days on the question that you just raised, the second part, the part under the State Employees with Insurance Act. And in that part, they took the position, they didn't have to bargain about things like what I just indicated. And what's interesting is that in their final offer, the very first offer they gave to the arbitrator, they reserved the right to make decisions unilaterally on all matters of health care. The union took the position, that's an unfair labor practice. You have to bargain with the union on these kinds of questions. So they came back two days later, with the permission of the arbitrator, with a new offer. That new offer covered all the kinds of services that we had put in our offer, the ones I just mentioned, vision, dental, surgical tip coverage, hospice coverage. And these are the kinds of things that are benefit and service levels that the labor board didn't want to talk about. So in the context of the State Employees with Insurance Act, what the state is saying is, under Section 5 of that act, and Section 15 of the Labor Act, we don't have to bargain with you about that. In other words, it's excluded. The problem that we see with that argument, as defined by the AOJ, in our opinion, correctly, is that Section 5 of CJA specifically provides for collective bargaining. It specifically says in Section 5 that the director of CMS can enter into contracts, including proposed contracts for collective bargaining. That's all it says about that question in the first page of Section 5. In the second page, it says there are employee enrollment periods, and they can be extended by 15 days if, in fact, there is a contract that has yet to be ratified. You've got about two more minutes left, so let me ask you to finish up this segment, and then you'll get a chance to come back in the second half. And then in Section 7.1 of the statute, there's a provision that says anything that the union bargains about may be passed on to the non-union workers. This statute does not prohibit collective bargaining. What they didn't argue about in their brief is a very important and fundamental point that the Supreme Court made in a case called Decatur, and that is that if there's another statute that covers a subject such as this subject of health care, the parties have an obligation to enter into collective bargaining agreements containing clauses which either supplement, implement, or relate to. That really is the heart of our argument with respect to the second point that you're trying to raise. Thank you. Thank you. Mr. Thomas. May I take some more? Yes, of course. May it please the Court, my name is Tom Bradley, and I represent the state. I apologize for misnaming you. No, it's quite all right. It's quite all right. People call me all sorts of names. The Court should exercise denial of review over the Labor Board's interpretation of the Labor Act and the Group Insurance Act, and it should reverse the Board's determination that the state is required to bargain over the director's design of the program of health benefits. If the Court applies the central city analysis, it should find that the burden of bargaining of up to 30 different health plan designs, which is what would happen if you affirmed the Board's ruling, far outweighs the benefits that would be realized as a result of such bargaining and find that the Labor Board's determination that the state is required under central city to bargain over the director's design to be clearly erroneous. The Court should affirm the Board's determination that the director does not have to bargain over contracting and vendors for the program of health benefits because Section 5 expressly authorizes the director to do so and the Labor Act does not require a contrary conclusion, and it should affirm the Board's determination that no sanctionable conduct was committed when the state presented evidence and argument that the state had not previously bargained health care plan design with any union. The agency makes an argument in their brief that we don't need to review the alternative portions of the Board's decisions relative to health care. If they're mandatory or not, we can get to the issues here without reviewing that. They make that argument in their brief. We don't need to affirm the Board's decision to allow us to not file APX. I'm looking through the argument that you just made. Right. So, Josh, here's why that's not correct. We originally went to, in January of 2016, we requested a declaratory ruling that there's no need to bargain over health insurance. The general counsel of the Labor Board suggested that we file an unfair labor practice charge. That's why we did it. We filed an unfair labor practice charge. It was dismissed in August, I believe, of 2016. The Labor Board said that the impact of the 2004 amendments on the obligation of the parties to bargain is a matter of first impression. And sent the matter back and said that dismissal should be overturned. We should have a hearing on the unfair labor practice because of the 2004 amendments. That is what's at the very heart of this case. The amendments to the Labor Act, the amendments to the State Employees Group Insurance Act, are what's at the very heart of this case. And the board's decision says that we don't have to bargain over contracting and vendors, but we do have to bargain over other aspects of plan design. That is at the very heart of this case. There is nothing else that would be here but for that piece of the case. But if you look at it from a different perspective, you could say that the heart of this case is whether or not the union committed an unfair labor practice and whether the UOP should have been dismissed. That's the judgment that we are called upon to review. And the judgment lies here all the time. Not all the time. That's our starting point. The reasoning the board used to get to it is important to us. But again, I think both sides are talking about this case as if it were a declaratory judgment as to which of any of the five elements of health insurance are bargainable. And I'm not sure I see it that way. I see it as the issue before us is whether the UOP was properly dismissed. Tell me why not. It was improperly dismissed, Judge, because they insisted that we go to interest arbitration over a permissive subject of bargaining. And then, going back to my question that I asked Mr. Diallo, the board decision is three parts. The first part says that the state did not raise this timely, and therefore it was—they don't use the word forfeited, but they basically say it was forfeited. That concludes with a conclusion line saying, therefore, the UOP is dismissed. Okay. And if it's a permissive subject of bargaining, it can be withdrawn at a time. And I understand that's your position. Right. So, before you get to that argument, you have to first make a determination as to whether it's a permissive subject of bargaining. If you determine it's a permissive subject of bargaining, it can be withdrawn at a time. Isn't it possible in the wider world of labor law to have something that is unquestionably a permissive subject of bargaining, but the party taking their contrary position, a party that doesn't want to bargain, and that simply waits too long to raise it, and therefore it becomes too late? There's nothing in the Labor Act that contains any— You said you talked about good faith. What does that seem to mean to you? If you made a good faith objection, you can withdraw it. We went to the—we asked for a declaratory ruling on this. We were told to file a labor practice charge. We filed the charge. The board said we had raised a matter of personal question. As soon as the board ruled, we asked the interest arbitrator to stay, whatever he was about to do, until we could finish the litigation over the unfair labor practice charge. There was nothing more that we could have done than what we did. We did everything we could do, asking for a declaratory ruling. When we were asked for that, we were told to go file the unfair labor practice charge, and we filed that. The board said that this is a matter of personal question, and as soon as they ruled, we asked— I remember writing the email after I read the labor judge's decision. Immediately, we asked them to stay this whole thing so that we could leave it. That was the situation. This whole thing began at some point in time. The two sides said, hey, our contract's expiring. We need to get together and bargain a new contract for whatever it was, 15 to 18, or whatever the range of years was. Yes, sir. Wasn't the time the state should have raised its objection to bargainability was basically on day one of those negotiations, as opposed to bargaining over all these things, and then at a certain point, maybe months or years later, saying, oh, by the way, we think these are permissive, and therefore we're invoking this regulation, and we're making good faith objections to bargaining these particular aspects of health insurance. In fact, in reality, what has happened, historically what has happened, is that the state bargains with AFSCME, and once it sets the plan design with AFSCME, it then presents that plan design to every other union, and the record is replete that every other union has a clause in their collective bargaining agreement that says, when they get that out of the door, it provides to everybody else. That's what's historically happened. In this case, this was not AFSCME, this was the troop regime. Right, and in this case, what happened was the negotiations with AFSCME went on for 67 days. We didn't reach impasse with AFSCME until January 6th of 2016. It was within the same time period that we were making this presentation, so we didn't have a plan design that AFSCME had agreed to yet. So that's what made this actual situation a little different from what had happened in the past, but the notion that the state somehow acted in bad faith by asking for declaratory ruling, being told to go file our undelivered practice charge, filing the charge, and as soon as the charge was filed, you know, found to be revived because it was a matter of just aggression, instantly asking that this matter be stayed on this issue until we get a ruling. But while all that's going on, you guys, even CMOS, are still bargaining over all five elements of public insurance. You know, there's a lot in this record about, well, we're going to make all these objections, but we're still bargaining, and we're reserving our rights, and we're reserving our rights on the other side too. And that still forms the basis for why the board did what it did. Sure, but in January of 2016, the law, as Mr. Gowda has articulated it, had been in violation of public insurance. That's because no one had ever raised the issue of the 2004 amendments before. The arguments that are in this brief. No one had ever raised that issue before. And as a result, the old case law was irrelevant, and it was the case law we had to live with at the time. So at the time, the case law wasn't like a bargain over health insurance. Of course we were going to comply with what the case law said. At the same time, we were challenging that case law based on the 2004 amendments, which no one had ever argued before. There was no good option, because if you say to us, we have to violate the existing case law in our bargaining, how is that good faith? How could we be acting in good faith if we were to do that? You asked for a stay. You asked for a stay, but that ended up getting denied by I think both the arbitration panel and the board. Yes, Judge. But the board did not go. So in January, the reason we proceeded the way we did is because we had the law as it was, and we were acting in compliance with the law. If the public court's ruling is that our acting in compliance with the law in our collective bargaining was bad faith, we'll have to think about that. Let me... Counselor, can I just ask you a quick question about the procedures of the declaratory issue? How is that requested before the board to have a ruling on the declaratory issues of what's covered? Right. So under the act, I believe under the rules of the act, you can ask for a declaratory ruling as to whether a matter is or is not a mandatory subject matter. And then you did that? We did that. By motion from the board? We made a submission to, not to the board itself, but I believe we made the submission to the executive director. Okay. So what happened to that? So we submitted to the executive director. Well, there's this rule in 2014 that says that health care is a mandatory subject of bargaining. I'm not like that. By the way, I find your arguments under the 2004 amendments to be interesting, and so I asked you to go file an information protection charge, which is what we did. And the board said the same thing to us. My name makes me the captain of the board of trust. If this is a matter of personal passion, it ought to be heard. And Joel's right. They asked for a complete record so that they could make a decision on whether bargaining over health care plan design is a mandatory subject in violation of the 2004 amendments. The ruling was never made on the declaratory issue. It wasn't made on the declaratory issue. It wasn't made on the declaratory issue. Yeah. And I know Justin said, what's the ruling that whoever the executive director said, I'm going to abide by the prior ruling, and that's the decision, but it is interesting. You should go another route and take it to the next logical step. That's exactly right. So to characterize the state's actions in this bargaining as bad faith, when we did everything that we could have and should have done every step along the line, and to get out that way and to not address the very serious underlying issue of whether the state is going to have to have, not just for the troopers, but inevitably for every one of the 30 collective bargaining meetings it bargains, 30 different plan designs would be, we would urge this court not to do this. Help me out with the labor law scenario here, okay, because it's sui generis. Couldn't you have basically walk away and said, you know, as soon as Mr. Gallo said let's talk about vendors, you could say we're not talking about vendors. Drop that. And then he could have filed a run for labor practice, right? But you kept talking about vendors and all these other things while you were making objections in other forms. Am I wrong about that? Well, our bad faith was in continuing to bargain. If somehow continuing to bargain was evidence of our bad faith, and we should have just stopped bargaining completely and rolled all the dice on a legal argument that no one had ever accepted before, I don't think that's a reasonable way to expect the state to have proceeded in these negotiations. I have two housekeeping questions. Where I left off was there was a governing body that rejected the arbitration panels award. Yes. All right. So that under the statute triggered a supplemental arbitration. Yes. Where was the status of that? So here's what happened. It went to the governing body. The governing body rejected the award because of the health insurance and one or two other things. It went back to the arbitrator. We sat down. We had another evidentiary hearing. We then, based on that, issued a supplemental ruling. We went back to the governing body. I think the governing body rejected it a second time. We then went around on a third time and did that for a third time. And then that was the last time with the governing body. So we ended up filing an action challenging the interest arbitration award. That's pending in the county case. Yes, the second time. So as we sit here today, the union's last offer on health insurance is in force or not? You said you're the one who's suing the state and the county. We sued for vacature, Judge. So at this point we're suing for what? We're suing for vacature. Vacature. So we're seeking to vacate the award. So the final award after all the wheels have spun was to implement the union's health insurance offer. Is that correct? Yes, Judge. I didn't promise us to use that. I just identified vendors in that last proposal. So to that extent, it is also contrary to what the vagrant board's ruling was. And what's the fairness of what you characterize as a vacature case in saying in the county? They're in that style of thing. Are you briefing right now? Motion. There's a motion to stay based upon your decision. That's right. Did the court actually stay that case pending our decision? No, but that motion is there. All right. There's a motion. Thank you. All right. That's my housekeeping questions. All right. Go ahead. Judge, let me just go through the statutory discussion argument because I think it is so clear. And you have to know how we review over this. And for all the reasons we just discussed, we think it's essential that we get a ruling on this. I can tell you in about ten minutes. Ten minutes. I can do it in ten minutes. So Section 5 of the Group Insurance Act, we're going to talk about a number of sections here, but they're basically two statutes. The Group Insurance Act and the Letter Act. Okay, those are the two statutes we're going to talk about. Section 5 of the Group Insurance Act requires the director to administer the Group Insurance Act consistent with a state policy. That policy requires stability and continuity of benefit programs. Programs are a defined term under the Group Insurance Act. They are defined as programs designed by the director. So that means that then Section 5 requires the director to administer the act consistent with the state policy. It requires the director to administer the act in a way that produces consistent programs that the director himself designs. Now, this statutory instruction is consistent with Section 6 of the Group Insurance Act. Section 6 of the Group Insurance Act says, and I quote, the program of held benefits shall be designed by the director, end quote. Section 6 further requires his design to include reasonable controls such as deductibles, co-insurance, and other mechanisms that prevent or minimize unnecessary utilization of medical expenses. This is what comprises health care plan design or the program of health care benefits. We're not talking about premiums. We're talking about the program of health benefits. So if you go see a doctor, you have a co-insurance you have to pay, you have a co-pay that you have to pay, there are out-of-pocket maximums that you are subject to, and there are so-called actuarial values that are computed for that end of the plan. Okay? So that means that Section 5 requires the director to design the health plan, which means it requires him to design the out-of-pocket maximums, the co-insurance, the co-pay, and the actuarial values. Now Section 15 of the Labor Act, Section 15A, we're going to move over to the other statute now, Section 15A of the Labor Act exempts Section 5 of the Group Insurance Act from its supremacy clause. Okay? Supremacy clause of the Labor Act says if there's any conflict between the Labor Act and any other statute, the Labor Act controls except for Section 5 of the Group Insurance Act. Okay? That's part of the 2004 amendments. It goes on to say that since 2004, no one, no employer or department or union, has taken the position that that parenthetical clause took health insurance for state employees off the bargaining table. Well, first of all, the state did in this matter. The State Employees Group Insurance Act only applies to the state, so it wouldn't apply to any other public employee, any other public employee. That's right. So we're only talking about one private employer here, that's the state of Illinois. It wouldn't apply to municipalities or anybody else in the state of Illinois that the Labor Act would also cover. And this is the first time the state has asserted this argument. Okay? But you have to understand that up until this point, the states had voluntarily bargained with one union nationally to help their plan design. No one, well, I know there's a dispute over this, but arguably no one had ever asked us to bargain over plan design before. Okay. So this interpretation of Section 5 as requiring the director to design the health plan is also consistent with another section, another portion of Section 15 of the Labor Act, which says that the Labor Act is subject to Section 5 of the Group Insurance Act. It's subject to. Now, the dictionary definition of subject to means that it's under the power of. It's placed underneath. Okay. So because Section 5 is exempted from the supremacy clause, and because the Labor Act is subject to Section 5, we assert that the proper way to interpret those two statutes together in parliamentary is to say that you don't have to bargain over health care plan design because that's what's provided for in Section 5, and it's exempted from the Labor Act, and the Labor Act is made subject to it. Now, this construction is also consistent with another section of the Labor Act, like Section 7 of the Labor Act, which says that an employer does not have to bargain over a medical specifically provided for in another law. Now, the way this works is if something is specifically provided for in another law and it doesn't conflict with the Labor Act, you don't have to bargain over it. Here, health care plan design specifically provided for in another law, Section 5 of the Group Insurance Act, it does not conflict with the Labor Act because it's exempted from the Labor Act, and the Labor Act is made subject to it. Therefore, interpreting Section 5 as authorizing the director, requiring the director, to design the program of health benefits and not bargain over that design is also consistent with Section 7. Interpreting Section 5 this way, which is to say that Section 5 makes the director the power to design the program of health benefits and he doesn't have to bargain over it, is also consistent with the way that the state and the unions have actually behaved with one another since the 2004 amendments were put into place. Since they put those amendments into place, I will tell you what the terms of the most recent classified agreement with this union, what it says with regard to plan design. It says, during the term of this agreement, the state shall continue in effect for all eligible employees and their eligible dependents the benefits, rights, and obligations of group, health, private, and other insurance under such terms and at such rates as are made available by the director of social management services. So it's also consistent with the way the parties have dealt with one another. You have de novo review over the board's interpretation of these two statutes and you should give the board no reference to its interpretation of the Group Insurance Act. Also, no question that Section 5 just gives them utmost responsibility to design the plan. Yes. And what involves designing a plan? Do we know each and every component of what a plan is composed of? Oh, my gosh, Judge. We went through this in copious detail in the unfair labor practice hearing. It would take a really long time to go through it all. Let me just telescope it. But my point is, the director gets to design every component of that. Not premiums. He has to bargain over premiums. So what happens is, you design a plan, co-pays, co-insurance, everything else. Then you come to the bargaining table and you say, this is the plan we've designed. Correct. Then you bargain over premiums, wages, overtime pay, holiday pay, merit pay. My question is, that plan is set in stone, then, pretty much. Yes. You're saying you don't bargain over, like, should mental health coverage be included or should certain types of severe nursing care be included. Right. You don't bargain over. Most of that has been provided for in the Group Insurance Act. There's a section that says all these things have to be in. And then it says, here's a short list of things that you can't put in. Very, very controversial things. So most of that is already decided. And then you have the Affordable Care Act, which requires health care plans to have certain things and to make them free. Right. So there's a whole overvalue of statutes and regulations that more or less guide what's going to be in the plan. But just to get it clear, there's no way the unions could be hurt by your ruling this way, because you're still going to come to the bargaining table with every single union and say, here's our health care plan design. And if they say, you know what, that's going to cost us an extra 5%, you can bargain over reducing premiums, increasing wages, increasing holiday pay, increasing overtime, providing merit pay, which, by the way, we've tried at length to bargain in this case, so that people can have some sort of balance. And that's another reason why you should apply the no-no review to interpret those statutes. Do you think there's going to be conflict between the two statutes or not? Between which two statutes, Chuck? Well, the... Between the 2nd Amendment and the 2nd Amendment? Between the 2nd Amendment and the 2nd Amendment. I don't think there is, because if there were, the Labor Act exempts Section 5 and sets it subject to Section 5, which to me resolves any conflict. Further, when you're interpreting statutes on a no-no basis in parliamentaria, you're supposed to read them together. You're supposed to read them as though they want to say there's not a conflict. So that's your obligation in doing the no-no reviewing statutes are in parliamentaria. Mr. Brentman, let me ask you to bring your comments to a close. Okay. Let me just also say, for the Central City argument, we would have to bargain 30 different health insurance designs under 30 different contracts, even though there's only one we need before you today. The burden of doing that would far outweigh any benefits that would be added to that bargain. Thank you. Thank you, Your Honors, and I look forward to answering your questions in the next round. Thank you. Ms. Metz-Golaris. Good afternoon, and may it please the Court, Assistant Attorney General Anne Metz-Golaris, on behalf of the Board of Rewards. This Court should affirm the Board's order on both its determination that the law should not commit an unfair labor practice and in its discretion in not sanctioning the state. As to the unfair labor practice issue, regardless of whether health insurance is a mandatory or punitive subject of bargaining, the lodge did not pursue that issue during bargaining and to arbitration and during arbitration in bad faith, in light of the party's conduct, which alone does not render the lodge's actions a violation of the Act. This includes the state's failure to clearly indicate to the lodge during negotiations or upon submission to the arbitrator that it believes health insurance is a permissive subject of bargaining. That is, the state never made health insurance a contested permissive subject of bargaining. In fact, it not only bargained willingly over health insurance, it also stipulated to the arbitrator's jurisdiction over that subject. In addition, the state failed to clearly and timely object to the interest arbitrator's consideration of the lodge's health insurance proposal as a contested permissive subject of bargaining. Let's keep in mind that the state is a sophisticated party in terms of bargaining, arbitration, and board proceedings. It is not a novice when it comes to willingly agreeing to bargain and arbitrate matters, and as this court has noted, as does a certain Wheaton Firefighters, this court may affirm the board's determination on the unfair labor practice that the lodge did not violate the Act on this basis alone. If it does so, there is no need for this court to even review the board's alternative grounds supporting its decision that health insurance is not statutorily excluded from bargaining and that certain aspects of it are mandatory subjects of bargaining while others are permissive. What about this declaratory issue that your opponent talks about? He's talking about the effect of the state's 2016 petition for a declaratory ruling to the board's general counsel. What the state is claiming, I think, is that that was a clear and timely objection to the arbitrator's consideration of health insurance before it. Now, this took place after the parties had already agreed to submit the issue to arbitration and had stipulated to that issue before it. This took place after objections were due to the arbitrator on each party's health insurance proposal. This wasn't a clear and timely objection to the arbitrator considering the lodge's health insurance proposal. It was merely a request for guidance from the board's general counsel on the state's own health insurance proposal. It didn't ask or identify any part of the lodge's proposal as a permissive subject of bargaining and it made no objection to any part of the lodge's proposal, though it did say that there should be no duty to bargain health insurance generally. But this came after objections were due pursuant to the arbitrator's own orders and the lodge could then, once the general counsel issued the declaratory ruling in March of 2016, the lodge could rely on that declaratory ruling that health insurance is a mandatory subject of bargaining and that would put on the lodge any duty to withdraw its own health insurance proposal from the arbitrator's consideration. On that note, the state also seems to indicate that it made a clear and timely objection by filing the unfair labor practice charge in March of 2016. That was not a clear and timely objection to the arbitrator's consideration of the issue. Again, that was pursuant to a board proceeding and I will point out the state's own brief in its June 26 post-hearing briefing to the arbitrator referenced the unfair labor practice charge before the board and the state specifically said that it did not object to the arbitrator's consideration of the health insurance issue. As counsel pointed out and the court noted, it was first in August 2016 that the state attempted to make an objection and first notified the arbitrator pursuant to board rules 1230.90k, alleging it had a good faith objection to the arbitrator considering the health insurance issue, asked the arbitrator to state its decision, pending the board's ruling on the unfair labor practice charge, but that was not a clear and timely objection. The arbitrator himself ruled, the neutral arbitrator of the panel, ruled that this came seven months, seven months, after the arbitrator ordered objections to health insurance proposals before it, four months after the conclusion of the hearing, two months after the post-hearing arbitration brief. And in that, the state still never specifically objected to Elijah's proposal. The state didn't withdraw stipulation to having the arbitrator consider the issue and it never withdrew its own proposal. I asked Mr. Gallo a few minutes ago about my reading of your client's decision. Okay. Part one is everything you just talked about. Yes. The state didn't timely object and it has a conclusion at the end, because of this untimely objection, the UOP is dismissed. And we get the big second part, which is the statutory obstruction issue. Correct. There's nothing in the board's decision that says what happens because of that. Am I not reading it correctly? So I would categorize the second part of the board's decision as an alternative conclusion as to why the lodge did not bargain in that case, why the charge had to be dismissed. There's a way to write that with a conclusion saying, on this alternative ground or even though we did not reach a meeting, we're going to talk about it anyway, there's nothing in there saying that. Let me just back up and explain. It hopefully would be more clear to the court. This goes back to A, the statutory exclusion issue, and B, the mandatory and permissive subject for bargaining. Now, a mandatory subject of bargaining is a subject that is required to be bargained under the Labor Act but which the parties need not agree on. A permissive subject of bargaining under the Labor Act is one that the parties need not but may choose to bargain, but once one party raises a suggestion, that party can't be forced to concede on a permissive subject in order to reach agreement. And that's the Stokey case, too. Correct. That's correct. Stokey-Wheaton. So what the board did, and what I would construe as its alternative holding, its alternative basis for finding that the Lodge didn't violate the Act is, the Lodge couldn't have violated the Act if the third that the board deemed were mandatory subjects of bargaining. That is, the third had to be bargained and the Lodge didn't violate the Act by insisting on bargaining them and putting them before the arbitrator. The board also made a finding that the procurement and the choice of vendor are permissive subjects of bargaining, but the Lodge wouldn't have violated the Act because it made a finding that the Lodge's final proposal didn't ask that the arbitrator to rule on them. There's a lot of talk in my opposing counsel's brief about the Lodge submitted this list of vendors with its final proposal to the arbitrator, but the board found that it didn't ask that the arbitrator rule on those, but it submitted this vendor list from the prior contract for informational purposes. So the Lodge wouldn't have violated the Act because it didn't submit those permissive subjects to the board. Was there ever a request for clarification of that? Number two, we're calling it. Was there ever a request by any side for clarification as to what that meant? There's not a process for the board to reconsider it. Oh, like a petition? Sure. Not that I know of. Thank you. And again, this wouldn't be, if the board, I'm sorry, the court would only have to reach the board's alternative holding on the unfair labor practice issue if it decided that its first, what I call the wheat and spoky conclusion were wrong. And again, if this court reviewed the board's decision on the mandatory and permissive subjects of bargaining, which comes after the statutory exclusion, which the board concluded that health insurance generally is not statutorily prohibited from bargaining, that's really not a declaratory judgment action for the court. We're here on administrative review. The board decides mandatory and permissive subjects of bargaining under the central city text, which it applied here, and that is subject to review by an appellate court under the clearly erroneous standard. So the court wouldn't go out on its own and say, we think these are mandatory, we think these are permissive. It's, we think the board didn't clearly err into determining that these elements are mandatory subjects of bargaining and these elements are permissive subjects of bargaining. So nobody else got in there? No. Again, because this whole process is sui generis. It's not standard litigation, right? Correct. Okay. You can go to the board and say we want a declaratory ruling on what is and is not mandatory and permissive and prohibitive subjects of bargaining, right? Yes. And that was done here. Right. And that was, there was a ruling made by the executive director or the general counsel, I forget which one, but because that decision maker sort of pointed a finger in the air and said, file a ULP on this, that declaratory ruling stopped at that point, right? It didn't go up any further. It doesn't go up any further. It doesn't go up any further. It doesn't. So the remedy is, if you don't like the declaratory ruling, you have to file a ULP. It's up to the parties what to do after that. A written declaratory ruling from the board's general counsel is a request for guidance. Can we continue to bargain and not violate the act? And that's because the declaratory ruling here was based on prior board precedent and prior general counsel's determination. And if you don't like what that person says, what do you do? Well, here the state filed the ULP. Okay. I'm sorry, you don't seek review of a declaratory ruling. Again, it's a request for guidance as to how the parties can act during bargaining. Again, because the general counsel issued the declaratory ruling and said this is a mandatory subject of bargaining based on prior board precedent, that would not require the lodge to then withdraw its health insurance proposal if it was a mandatory subject. Again, a mandatory subject of bargaining is one that the parties have to bargain. So the fact that the lodge put forth before the arbitrator an actual ruling from the arbitrator wouldn't have been bargaining in bad faith under the act. Let me address the union brought up, the lodge brought up during their opening, that the board both wrongly decided these six discrete elements of health insurance, yet it didn't decide whether types and levels of benefits and services were bargainable. First of all, the board detailed the six aspects of health insurance and said other aspects of health insurance were not fully discussed or analyzed by the board and the board would not decide them because they weren't presented in such a way. So the board never commented on the types, levels, and benefits of services. This court had nothing to review from the board on that point. And the lodge isn't aggrieved by the board not speaking to it. It doesn't mean that it excludes bargaining on those subjects. It just means the board didn't speak to it. If a party has a problem with what is presented to an arbitrator or what an arbitrator can consider an interest arbitration, there's a statutory mechanism to seek review of that, and that's in section 14K of the act, which is filing an action in the circuit court asking the determination whether certain topics were within the arbitrator's statutory authority or jurisdiction to consider. Is that the kind of case that's being filed in Sangamon County? The board's not a party to the case in Sangamon County. So I only know about that case relative to what was attached to the applied briefs in this case. I don't think that has been done in the past. I'm sorry? That section hasn't been used in the past. I would think so. The board isn't a party in those types of proceedings because in those proceedings from the way I read the act, a party would go to circuit court to contest something that the arbitrator did or didn't rule on, and the board is out of it at that point. It's just a party. The law also claims that the board's decision was wrong or the board violated its own rules because it divvied up these portions of health insurance and made the ruling in its alternative holding on the mandatory and permissive subjects without the state putting any of this in its exception from the ALJ's recommended decision to the board's order. From the get-go, including the filing of the charge, which is one of the first couple pages of this enormous record, the state always said, always argued, that health insurance should be a permissive subject. That was no surprise. As the hearing went through, you know, the evidence was on bargaining history. It was on procurement, choice of vendor, deductibles, premiums, all of these things. And so what the board did is not unlike what a court does. A board, like a court, is not confined to only those things that a party says it has to decide. A court, the board, like a court, can pinpoint issues or be more discreet in its rulings than perhaps a party has indicated. But it's clear, I would say, the union was not denied notice or an opportunity to be heard on any of these issues, especially after a 10-day administrative hearing. Thank you. Do you have a couple of moments left? Sure. I would like to address one thing. The state keeps saying, you know, what if we're getting an errand? What if that's happened? If you say that we have to bargain these things, whether it be because of the board's initial ruling that the lodge didn't violate the act under the Wheaton-Skokie analysis, the state says, well, now look where we are. We have to bargain with all of these bargaining units. But that's on the state. It's got really nothing to do with the board's order. And this is because, as the record reflects here, the state is engaged in pattern bargaining up to 2015, meaning they would bargain health insurance with AFSCME. They would take whatever they agreed to with AFSCME to the other bargaining units represented by other unions. Typically, that was accepted by those other unions and bargaining units. And then they would bargain about other things. We'll take the AFSCME plan if we get an increase in wages or something like that. So to the extent that the state is bargaining with several different units represented by several different unions now, it's because they declared they were in pass with AFSCME in 2015, and they went out and separately bargained these contracts with multiple bargaining units represented by multiple unions. Would the court like me to address at all the sanctions issue? I don't have any questions about that. No questions about sanctions? Okay. With that, I would wrap up my argument. If there are no further questions, yes. Is there any confusion between the Labor Act and the State Employees Insurance Act? I don't think there's a conflict. I think as the board has, of course, we don't get there unless the court would overrule what I call the wheat and stoke argument. Section 15 of the Supremacy Clause of the Labor Act talks about in case of any conflict between Section 5 in particular of CDF and the Labor Act and that the provisions of the Labor Act are subject to Section 5 of CDF, both of which were contemporaneously amended in 2004. But Section 5 of CDF contains, pursuant to those amendments, it imposes certain duties on the director of transparency measures in contracting, right? We want transparent government contracts in contracting with vendors, in renewing contracts, in making reports with information to COGFA and making other similar reports. There is no conflict with the Act's broad bargaining provisions in Section 5. It contemplates bargaining can take place over health insurance while adhering to all of those requirements in Section 5. There is no tension between the Act's broad duty to bargain and the provisions of CDF. Had the General Assembly intended that health insurance not be bargained or be prohibited from bargaining, it would have said so either in the Labor Act or in CDF. It did not. The Board can't read that type of prohibition into either Act. This Court could not read either type of prohibition into either Act. Indeed, CDF's plain language contemplates collective bargaining in language in Section 5 and Section 7.1. Section 5 says all contracts for the provision of employee benefits, including those portions of any proposed CBA that would require implementation through contracts under those Acts are subject to its requirements. And 7.1 of CDF says any benefit received by an employee under this Act pursuant to a collective bargaining agreement may be extended. Similarly, the Labor Act in Section 7 makes provisions and contemplates that there might be other statutes or other laws that relate to subjects that have to be bargained. It says that collective bargaining agreements might contain clauses that supplement, implement, or relate to those other laws that are relative to subjects that are required to be bargained. Thank you very much. With that, I would ask that the Court affirm the Board's decision. Thank you. Again, because of the consolidated nature of the cases, we were generous in terms of allowing each side to address both their own case and to respond to the opponent's cases. So we're going to give everybody about five minutes for a brief rebuttal in the same order, all right? I don't want to be strict about it. Thank you, Your Honor. In answer to Justice Conner's question, there is no conflict, I think, between the two. Let me point out, let's reset the seizure. The statute says, Section 5, subsection V, meaning lower case 5, that the contract benefit choice period can be extended by 15 days if there's no ratification of the contract. This comes after a section that says the CMS collector is to create contracts for health care, including proposed collective bargaining agreements. How those two interact in terms of Section 15A is we cannot go to the labor board for the DR, we can't go to the employer and say, we want to extend the benefit choice period for 30 days. The statute says 15 days, and that's a bar. But we can bargain about other matters, and what we can bargain about are basic benefits. In answer to your question, the point two point of this, there are health care levels of benefits. If all we're going to have us bargain about are premiums, copayments, deductibles, and out-of-pocket maximums, because that affects our compensation, what are we going to do when they cut off our mental health coverage? What do you mean when you say you can't have vision care? That's a unilateral determination that they can make under this theory. That's unfair. That's not what the General Assembly wanted. And you believe those things are sort of in the realm of vendor selection? No, vendor selection has nothing to do with this case. They made it very clear in the ALJ opinion that we did not ask for vendor selection. We put in four sets of dollar amounts for specific vendors, and even their own witness said we weren't asking for specific vendors. Vendor selection and procurement has nothing to do with this. The normal course is you buy them a contract, and they go to the vendors, and they find out how much it's going to cost and how to set it out. But what happens in Section 6, their own witness, Armstrong, said this. This is a basic claim. In other words, the statute says the program may include, but shall not be limited to, several mental health coverage, out-of-pocket diagnostic, and other kinds of things. And then it goes on to say shall be designed. That's where they get the word shall be designed, to include expected distribution of expenses and covered benefits and services. It doesn't say a word about what the benefits are going to be. That's all subject to Section 7 bargaining. Section 7 says you can bargain about something that supplements, implements, or relates to, that's what this is about, and that's why their interpretation is incorrect. Which is, with respect to the question of how to agree, they violated their own rule. Their rule says you have to have an exception. So when they narrowed this, they said in their narrowing, we're following what the state's asked us to do, but it never followed the exception. So we're taking the position, Your Honor, that is something you should be concerned about. And second, with respect to the St. Louis County case, in answer to the question from Justice Conner, they said what happens when you have an arbitration decision you don't like, which is what they did, you file a motion to vacate it. What they're saying is vacate this arbitration award, because it includes subjects of bargaining that we don't like. It doesn't serve anybody's interest to have us back before this court on unlawful labor practice or not to have that court have the benefit of your speaking about that question. That's why we're agreed. Thank you. Mr. Bramley. Five minutes. Thank you, Judge. First, I'd like to address a couple of points that the Board made. Number one, Central City applies where there's a conflict between Section 4 and Section 7 of the Labor Act. In that case, it was actually Section 4 and Section 11 of the Ed Act, because that case involved the Education and Labor Relations Act. But the same provisions in the Illinois Labor Relations Act are Sections 4 and Section 7. Section 4 sets forth the managerial authority. Section 7 sets forth the bargaining obligation. And what this court said was, when there's a conflict between these two, you balance. That's what courts do when there's a conflict between two sections of a statute. Here, there's no conflict. There's no conflict. The First Central City does not apply. There's no conflict. Section 4 sets forth what our managerial authority is. Section 7 says we don't have to bargain if it's specifically provided for in another law. Section 7 says it's specifically provided for in another law. That's what happened here. The Group Insurance Act specifically provides for the director designing the program of health benefits. Since there's no conflict between 4 and 7, Central City doesn't apply. You never get to the balancing test. You exercise the no-rule view over the statutes and the statutory construction. The analysis begins and ends there. Another thing I'd like to address is there's a difference between a prohibitive subject to bargaining and a permissive subject to bargaining. I think the board may have gotten a little mixed up on that. A prohibitive subject is something you can't bargain over. A permissive subject is something you can bargain over if you choose to do so. Well, our argument here is not that it's a prohibited subject to bargain, but rather it's a permissive subject to bargain. The director designs the program of health benefits. If he decides voluntarily to go bargain that program with AFSCME because they represent the largest number of employees, he can do so or she can do so. If they choose not to do so, they can choose not to do so. But there's no obligation to bargain with each in each of the 30 different contracts. With regard to bargaining over types of benefits, as I said, the group insurance act sets forth in pretty copious detail what you have to cover and the small number of things that you can't cover. We're not talking about that. We're talking about the co-pays, co-insurance, out-of-pocket maximums, and actuarial analysis, and that's all economic. We're not talking about taking away somebody's mental health coverage here. We're talking about the co-pays, co-insurance, out-of-pocket maximums, and actuarial. So that's not really accurate in terms of when we're talking about plan design. And is that in this case or generally? Well, generally speaking, that's what we're talking about in this case. I guess the director couldn't. The group insurance act gives the director some discretion about certain things that could or could not be in. That's really not what we're arguing about in this case, whether he abused his discretion by putting a particular type of coverage in or not putting a type of coverage in. We're talking about here's a broader principle, and that is that he designs a plan that says you've got a 10% co-pay, a $20 doctor's visit, and you can't spend it. Once you spend more than a million dollars, it's on your ticket or whatever that plan design is. And we don't have to redo that at every single union or every single collective bargaining agreement that we bargain over. In the end, you should apply for no overview to the statutory construction of the two statutes, not rely on the central city, although if you rely on the central city, we believe the evidence at trial is overwhelming as to the burden that would be placed on the director's statutory authority. His statutory obligation is to have a design of a health care plan which is consistent, which shows consistency. How would you do that with 30 different plans? How would you achieve that sort of consistency if you've got a lot of different plans and people then move from job A to job B at the state and they end up with a completely different plan with different providers, different doctors? It would be completely contrary to the statutory requirement. One minute. Thank you, Judge. And for that reason, we ask you to reverse the board's finding that health care plan design is a mandatory subject of bargaining. Thank you. Thank you. Thank you all. Do you need anything more? All right. Thank you, counsel, for your work and your arguments today. The matter will be taken under advisement and you'll hear from us. Thank you. Well done, everyone. The court will stand at ease for a few minutes for the next case.